AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |

BALANCED RETURN FUND LIMITED; et al.,
Plaintiffs,

V.

ROYAL BANK OF CANADA; et al.,
Defendants.

## SUMMONS IN A CIVIL ACTION

JUDGE RAKOFF

CASE NUMBER:

**08 CIV 5015**

TO: (Name and address of Defendant)

ROYAL BANK OF CANADA
One Liberty Plaza
New York, New York

(See Attached Rider For Continuation of Defendants Addresses)

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

SQUITIERI & FEARON, LLP
32 East 57th Street
12th Floor
New York, New York 10022

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

MAY 3 0 2008

J. MICHAEL McMAHON

CLERK _Jessica Jordan_

DATE

(By) DEPUTY CLERK

AO 440  (Rev.  8/01)  Summons in a Civil Action

| RETURN OF SERVICE | | |
|---|---|---|
| Service of the Summons and complaint was made by me[1] | DATE | |
| NAME OF SERVER *(PRINT)* | TITLE | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL  $0.00 |

## DECLARATION OF SERVER

       I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____    _____
                   Date                    *Signature of Server*

                             _____
                             *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

## RIDER TO SUMMONS

RBC CAPITAL SERVICES, INC.
One Liberty Plaza
New York, New York

RBC CAPITAL MARKETS CORPORATION
formerly known as RBC DOMINION SECURITIES, INC.
One Liberty Plaza
New York, New York



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BALANCED RETURN FUND LIMITED;　:
MENDOTA CAPITAL, INC.; COMMAX　　:
INVESTORS SERVICES LTD.; AND　　 :
COMPREHENSIVE INVESTORS　　　　:
SERVICES, LTD.;　　　　　　　　 :
　　　　　　　　　　　　　　　　:
　　　　　　　Plaintiffs,　　　　:
　　　　　　　　　　　　　　　　:
　　　　　　v.　　　　　　　　　:
　　　　　　　　　　　　　　　　:　COMPLAINT JUDGE RAKOFF
ROYAL BANK OF CANADA; RBC　　　:　JURY TRIAL DEMANDED
CAPITAL SERVICES, INC.; RBC　　　:
CAPITAL MARKETS CORPORATION　 :
formerly known as RBC DOMINION　　:
SECURITIES, INC.,　　　　　　　 :　08 CIV 50157
　　　　　　　　　　　　　　　　:
　　　　　　　Defendants.　　　　:
　　　　　　　　　　　　　　　　:

---

Plaintiffs, Balanced Return Fund Limited, Mendota Capital, Inc., Commax Investors

Services Ltd., and Comprehensive Investors Services, (collectively "Investors") allege herein

upon personal knowledge as to themselves and their own acts, and information and belief as to

all other matters, based upon, <u>inter alia</u>, the investigation conducted by and through their

attorneys. Plaintiffs believe that substantial evidentiary support will exist for the allegations set

forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE CASE</u>

1.　　　This is an action by plaintiffs who invested in Olympus United Funds or

predecessor or subsidiary funds ("Olympus Univest" or "OUL" or the "Fund"), during the period

from 2000 through mid-2005 and who have lost their investment as a result of the wrongful

conduct of the defendants which caused the Fund's collapse in June 2005. The fund is a fund

fronted by entities within the Norshield Financial Group but secretly managed by Royal Bank of

Canada ("RBC"). In 2005, Ontario Securities Commission regulators closed down all operations of Norshield and its affiliated entities. Olympus Univest, the last in a line of funds to which plaintiffs' investments were transferred, is now bankrupt and under the control of a receiver in Canada.

2.      Before the RBC caused its collapse, the Fund was under the operational control of defendant RBC and its subsidiaries (named herein as defendants) which at all relevant times acted as investment managers of the assets of the Fund in order to earn the huge fees and premiums for operating investment funds concentrating in "alternative investments." RBC concealed their role and interests and actions in the Funds to avoid having to comply with rules and regulations of the United States and Canada and the province of Quebec.

3.      Beginning no later than 1999, defendants, Royal Bank of Canada, (New York) ("RBC"), RBC Capital Markets Corporation ("RBC Capital" or "RBCCM"), formerly known as RBC Dominion Securities, Inc. ("RBCDS") and RBC Capital Services, Inc. ("RBC Services") (collectively the "RBC Defendants") entered into a relationship with various entities in the Norshield Financial Group involving the creation, marketing and management of investment of assets in "fund of funds" alternative investments. RBC participated in the creation of this investment vehicle by providing leveraged financial instruments whose terms were heavily skewed to favor RBC's operation and control of the funds investments to the detriment of the plaintiffs and other investors. The centerpieces of the Fund's investments created by RBC were a Cash Settled Index Call Option and a Cash Settled Equity Barrier Index Call Option (collectively the "RBC Option"). Over the years, by accepting more monies from investors, RBC and Norshield entities profited by increasing the size of the RBC Option to approximately

$400 million. RBC thereby was able to earn an ever increasing flow of fees and premiums. The Fund's outside investors, including plaintiffs, eventually poured over $450 million into the Fund.

4.    The investments were funneled from the entities in which plaintiffs invested (i.e., the Olympus Funds and their predecessors) to Norshield Composite Ltd. later renamed Mosaic Composite Ltd. U.S. Inc. (hereinafter "MCL" or "Mosaic"). Mosaic's assets were in turn managed by RBC as more fully described herein. The funneling of investors' funds through Olympus (and its predecessors) to Mosaic had no discernible commercial purpose other than to conceal RBC's role in the management of investors' funds.

5.    RBC was the de facto investment manager of the funds although it concealed its role and the extent of its control over the investments. RBC had the authority to retain and terminate investment managers, allocate the risk in the Fund's portfolio, allocate the investments, and held the most liquid and most valuable assets of the Fund in RBC's own accounts, thus maintaining control over these assets. Defendants, who were involved in the financing, oversight and operation of the Fund, had decision-making authority over various aspects of the Fund. As such, the defendants became fiduciaries of plaintiffs and were obligated to act in the best interests of, and exclusively for the benefit of, plaintiffs and other investors.

6.    The RBC Defendants knew, understood and helped develop the structure of Olympus Univest and its predecessors; conducted certain due diligence related to the Fund; and approved certain transactions designed to mask the Fund's financial problems. The RBC Defendants thus knew and understood that the Fund overstated its net asset values, concealed it's highly leveraged structure and the illiquidity of many of its assets and knew that the Fund allowed favored investors (not including plaintiffs) to redeem Fund shares at inflated values to the detriment of other investors. RBC reviewed and approved the Fund's and prospectus for sale

3

of investments which contained financial statements ("informational materials"), and thus the RBC Defendants knew of the material misrepresentations described therein, and participated in the dissemination of such false informational materials.

7.    Plaintiffs were misled by material misrepresentations in, and omissions from, the informational materials. The subjects as to which plaintiffs were misled included: (1) RBC's conflicted role in the management and oversight of the Fund assets; (2) the enormous financial risk to investors due to the leverage in the underlying funds extended clandestinely by RBC and which was not reflected in the Fund's financial statements; (3) the illiquidity of certain assets underlying the Fund; (4) RBC's alleged position as secured creditor to the detriment of Fund investors'; (5) the true net asset value ("NAV") of shares in the Fund; and (6) the risk that RBC as custodian of the Fund's assets would choose to terminate the option on short notice to the detriment of plaintiffs and other Fund investors.

8.    The RBC Defendants profited substantially from their role by receiving over $60 million from the Fund.

9.    After years of misconduct directed at Fund investors including plaintiffs, RBC, through the other RBC Defendants, delivered the final blow to investors, first by approving a transaction which depleted the Fund of liquid and valuable investments to allow favored investors to redeem Fund shares at artificially inflated net asset values and, later, when RBC prematurely terminated the RBC Option in order to sell the underlying basket of securities and recover for RBC the assets which investors had been led to believe belonged to the Fund in which they purchased shares.

10.    During the existence of the Fund, the defendants herein breached their fiduciary duties to investors, committed fraud and misrepresented material facts regarding, inter alia, the

4

investments, and acted in direct conflict with the interests of the plaintiffs and other investors in the Funds. As a result of the RBC Defendants misconduct, plaintiffs lost over $90 million.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to diversity jurisdiction as defendants are all residents of the State of New York and plaintiffs are all residents of Canada, and the amount in controversy exceeds $75,000, (28 U.S.C. § 1332).

12.    Venue is proper in this District as many of the acts and transactions alleged herein occurred in substantial part in this District. Many critical events occurred in this district and several defendants have previously consented to jurisdiction within this District. In addition, each of the defendants maintains offices in this District. Defendants' maintained their principle offices in this District. Many of the acts complained of occurred in this District. Under the terms of the RBC Option, RBC through its agent, RBCDS, agreed that such option would be subject to the laws of the State of New York. The overwhelming majority of the investment managers retained by RBC were U.S. based managers. RBC conducted substantial negotiations and held numerous discussions with entities in both New York and Chicago related to the RBC Option, Olympus Univest and the activities of the Fund. Furthermore, in connection with an assignment of the RBC Option in October 2004, the parties thereto, including RBC, consented to the jurisdiction of this Court.

## PARTIES

### Plaintiffs

13.    Plaintiffs, Balanced Return Fund, Mendota Capital, Inc., Commax Investors Services Ltd. and Comprehensive Investor Services are citizens and residents of foreign countries, and or states other than New York State purchased shares in funds offered by Olympus

Univest or its predecessors in interest and suffered damages as a result of defendants' breach of fiduciary duty, fraud, mismanagement, conflicts of interest, breach of contract and other misconduct.

**Defendants**

14.    Defendant RBC is a chartered bank association with offices in New York, New York at One Liberty Plaza, 165 Broadway, New York, New York. At all relevant times, RBC advised the public that it's banking, insurance, brokerage and other business (which it carried on through wholly owned subsidiaries, including RBC's co-defendants herein, were part of the "RBC Financial Group." Through its branding as the RBC Financial Group and in other ways intended to advance its business, RBC held itself out as the principal of its various subsidiaries including its co-defendants named herein. RBC's U.S. operations include RBC Dominion Securities headquartered in New York; Bull & Bear Securities, Inc. a New York based on-line discount broker and Liberty Life Insurance, among others.

15.    Defendant RBCDS was at all relevant times, and is a broker-dealer licensed to do business in the United States and is a wholly owned subsidiary of RBC.

16.    RBC Capital Services, Inc. ("RBC Services") was at all relevant times a wholly owned "sole purpose" subsidiary of RBC and an agent of RBC. RBC Services has its principle place of business at One Liberty Plaza, New York, New York.

17.    Defendant, RBC Capital Markets Corporation ("RBC Capital") was incorporated pursuant to the laws of New York and is a wholly owned subsidiary of RBC and is the U.S. broker-dealer affiliate of RBC and at all relevant times, RBC Capital was an agent of RBC. At all relevant times, RBC Capital has offices in New York City at One Liberty Plaza and 1211 Avenue of the Americas.

## SUBSTANTIVE ALLEGATIONS

### A.    RBC's Role In The Structure Of The Investment Funds

18.    In early 1998, Olympus United Group ("Olympus") then known as Norsheild Fund Management Ltd. ("NFM"), was registered under Canada's laws as a "Limited Market Dealer" and "Mutual Fund Dealer." Shortly thereafter, RBC began to work through NFM (later Olympus) to enter the "alternative investment" management business and reap lucrative fees.

19.    RBC embarked on its affiliation with NFM (later Olympus) in order to earn the huge fees typically associated with mutual funds and other pooled investments. By concealing its true role in the investments, RBC was able to avoid the restriction of the Ontario Securities Commission ("OSC") and the Province of Quebec.

20.    As evidenced in numerous SEC filings in the United States, Norshield has been RBC's broker dealer affiliate.

21.    During its relationship with NFM, RBC became party to Norshield's fraudulent conduct. Norshield is now in receivership amidst allegations of fraudulent conduct by its principals including John Xanthoudakis. On June 29, 2005, the Norshield group of companies (with which RBC was intimately involved in connection with the sale of investments to plaintiffs and other investments), were placed in court protection in Ontario and Quebec. In 2006, a receiver of all assets and properties of Norshield was appointed under Canadian law at the request of the Ontario Securities Commission and its counterpart in the Province of Quebec. According to the receiver approximately $500 million is owed to investors, including plaintiffs.

22.    Extant evidence points directly to RBC's involvement in Norshield's illegal conduct. According to filings in United States Bankruptcy Court for the Southern District of New York (Case No. 05-15776), it was represented that Norshield had wrongfully transferred

$27 million through RBC to Globe-X Management Limited, a company alleged to have

participated in an illegal diversion of funds from CINAR Corporation. Globe-X was a fund

which had experienced a liquidity crisis in March 2000.

23.    According to court documents, the receiver eventually charged the Norshield

companies, and its principals John Xanthoudakis and Dale Smith, with:

- diverting investors monies;
- making investments contrary to representations made in public documents used to solicit investments;
- making sham transactions to artificially inflate the value of Norshield's assets;
- misrepresenting the value of Norshield assets;
- transferring assets of Norshield for less than fair value;
- operating Norshield in aid of a scheme to divert assets

The receiver also charged that Norshield ceased to have any legitimate business purpose and

existed only to attract new investors to meet growing redemption requests.

24.    Defendants were the creators of the "alternate investment vehicles" and were the

managers of the investments marketed by Norshield and purchased by plaintiffs through Offering

Memorandum and/or Private Placement Memorandum. Later, it was the false and misleading

informational materials which induced plaintiffs to leave their monies invested in the Funds.

25.    By way of various offering and informational materials, investments in Norshield

and/or Olympus Fund were sold to investors. OUL was marketed and sold as hedge fund

investments through which investors could participate in alternative investment vehicles

purportedly under Norshield's direction. OUL was itself a roll-up of predecessor funds including

"Globe-X," "Globe" and "Comex." The nature of the investment was represented as a "fund of

funds," which pooled money from various groups of investors and then allocated those proceeds to various sub-funds.

26.    The RBC Option described below was the main asset of the Fund. On or about July 30, 1999, RBC as seller, entered into a Cash Settled Index Call Option ("RBC Option") with NCL, later succeeded by MCL as buyer. Mosaic is now bankrupt. The terms of RBC Option were set forth in a letter of agreement bearing reference number NY 1874 subject to an ISDA Master Agreement dated as of July 30, 1999 between Mosaic and RBC. On June 28, 2002 Mosaic and RBC entered into a Cash-Settled Equity Barrier Index Call Option whose terms were set forth in a letter agreement bearing reference number NY 3551. By agreement dated March 31, 2004 the options were merged and the aggregate amount of the merged Option was $353,125,333.00. Both options were subject to the ISDA Master Agreement. Upon information and belief, the reference numbers "NY 1874" and "NY 3551" indicates that RBC handled these investments from its New York office.

27.    For the purpose of negotiating and executing the RBC Option transaction, Defendant RBC appointed Defendant RBCCM to act on its behalf as its agent. RBCCM acted as RBC's agent at all times in connection with the RBC Option with the power to market, structure, negotiate, document, price execute and hedge transactions in the over-the – counter financial derivative instruments on behalf of RBC.

28.    The RBC Option was a financial instrument consisting of a "basket" of investments which allegedly would generate a return for investors including plaintiffs and which were managed by RBC. However, RBC also included contractual terms in the RBC Option to give itself control of the assets as if it were a creditor of Mosaic. The underlying baskets of securities were in the custody of defendant RBCCM and controlled by RBC. RBC set up the

documents to indicate that RBC maintained a security interest in the assets purchased with the funds. RBC maintained the funds and the hedged investments purchased in RBC accounts. To conceal its role, RBC insisted on confidentiality provisions in all of its documents reflecting the Options.

29.     The RBC Defendants had a direct, controlling and undisclosed role in all aspects of the operation and management of OUL/Norshield's management of the Fund through the Mosaic arrangement. Specifically, the RBC Defendants, controlled the selection of investment advisors, portfolio managers, the investment allocation, the leveraging and deleveraging of the Funds and the risk profile of the Fund.

30.     Despite its active management of the Funds' assets, RBC concealed its role and held itself out publicly only as OUL's banker. For example, in a Private Placement Memorandum issued in September 2003 RBC was listed only as "Banker (Classes B, C and E)" for OUL. In fact, RBC was the actual "Investment Manager" but concealed its role as such because it was not registered under Canadian regulations to be the Investment Manager of the Funds.

31.     OUL forwarded the almost all of its assets to MCL which nominally segregated the assets into "hedged" and "non-hedged" assets. At OUL, Investors' assets were commingled with institutional investors' funds and direct cash or cash equivalent investments and "in-kind" investments. The hedged assets consisted of the RBC Option owned by RBC. The non-hedged assets consisted of shares and debentures in non-public entities and were referred to as the "Channel Funds" which were invested in private companies including: a) Channel Fixed Income Fund Ltd.; b) Channel F.S. Fund Ltd.; and c) Channel Diversified Private Equity Fund Ltd. (collectively, the "Channel Funds").

32.     Since its purchase, the RBC Option was always a significant asset of Mosaic not only because of its value but also because the gross value of the basket of hedge funds served as the primary basis upon which the Fund's net asset value was calculated and reported to Investors.

33.     Over the succeeding years, the RBC Option was amended from time to time and the national investment of the RBC Option was increased. The option agreement contained a five year term (originally from 1999 – 2004) which was later renewed for a term through 2007.

34.     When the effects of the bursting of the NASDAQ bubble in technology and telecommunications stocks began to dissipate, the Funds began to attract significantly more assets as investors flocked to alternative investments. At September 30, 2003, the Channel Fund assets alone had an assigned book value of $368 million. This book value was inflated. In late 2005, the Receiver reported to an Ontario Superior Court Justice that the Channel Fund investments were placed in non-arms length entities with little or no realizable value.

35.     As of September 30, 2003, the consolidated net assets of Olympus Univest had an assigned book value of approximately $430 million. The growth in the Fund could not have occurred without the knowledge of and participation of the RBC Defendants, which enabled the growth of the Fund.

**B.     RBC's Operation Of The Funds**

36.     RBC was intimately involved in the custody, control and management of investors' assets in the Funds.

37.     At all relevant times, RBC retained nominal ownership and control of the investment account assets. RBC performed daily risk analysis of the invested assets in the Funds. Under an Investment Management Agreement between RBC and Norshield Asset

Management (Canada) Ltd. dated January 19, 2004, Norshield was required to render periodic reports to RBC.

38.     RBC had almost total control of the management of Fund assets. RBC Services was an indirect wholly owned subsidiary of RBC whose "sole purpose" (by RBC's admission) was to provide various services to and for the benefit of RBC. Defendant RBC Services, on behalf of RBC, negotiated and entered into the investment management agreements with various portfolio managers who managed fund assets. The "Investment Management Agreements" pursuant to which outside managers of the fund assets were retained, granted RBC sole power to choose investment managers and investment strategies and the allocation of the non-hedged assets. Defendant RBC Services, on behalf of RBC, was signatory to the agreement with each hedge fund manager it retained. Defendant RBC Capital, on behalf of RBC, had veto power over the selection of portfolio managers and also approved the portfolio allocations and acceptable risk levels for the Fund. Any investment advisor recommended by Norshield required approval from Defendant RBC Services on behalf of RBC, which also had the ability to veto or terminate such advisors and conducted its own due diligence on such advisors. The investment management agreements, a sample of which is annexed hereto as Exhibit F, were two party agreements between RBC, through its wholly owned subsidiary, RBC Client Services, Inc. and the manager. There were no advisor agreements between the investment managers and Mosaic – Defendant RBC Services on behalf of RBC negotiated directly with the investment managers and signed the agreements with managers who were selected.

39.     According to a high ranking officer of RBC Dominion (who testified under oath in a proceeding before the Ontario Securities Commission), in order to maximize their control

over the assets of the funds, RBC structured the investment vehicle so that it maintained control over the assets at all time.

40.    RBC monitored the activities of its selected investment and performed risk analysis to monitor the investment managers' compliance with RBC's investment guidelines.

41.    Defendant RBC was involved in all discussions regarding risk management of this portfolio. Discussions occurred between Winston Ho's group at Defendant RBC Capital in New York and Nick Markos (risk management for Norshield) regarding allocation, according to Winston Ho an officer of RBC Capital in New York. Negotiations were necessary whenever there were changes to the Fund, for example, due to redemptions.

42.    RBC, which held the asset portfolio of the RBC Option, had a right to call the assets in the portfolio if OUL and/or MCL were unable to pay down the leverage capital when called upon to do so. This was never disclosed to investors.

43.    The redemption features of the Fund provided protection to RBC on the asset portfolio of the RBC Option while exposing continuing investors to potential losses because early redemption demands were met by liquidation of the most valuable and liquid assets outside the RBC Option.

44.    Neither RBC's role in management of the investments or the RBC Options was ever disclosed to investors. RBC knew that the 600% leverage of the RBC Option, its relation with Norshield, its security interest in the hedged assets of Mosaic, and its power to terminate that relationship were not disclosed to investors in Olympus Univest.

45.    RBC went to great lengths to keep its involvement in the Funds concealed.

46.    In fact, the documents governing the RBC Option prohibited any disclosure of the RBC Opinion.

47.    RBC was in control of Mosaic, and was the actual Investment Manager of Mosaic. Mosaic appears to have been a "front." Mosaic in fact had no employees at any time relevant to the investments made by plaintiffs. Mosaic did not have access to information of daily trading activities of the funds conducted by the investment managers hired by RBC. For access, Mosaic needed RBC's permission. RBC knew or should have known that a Norshield employee designated as a "Compliance Officer" under OSC Rule 31-505 did not perform any compliance duties or have a compliance function for or on behalf of Mosaic or OUL. RBC knew that after February 19, 2003 there was no designated "Compliance Officer" acting for or on behalf of Mosaic or OUL.

48.    Officers of RBC, and its subsidiaries, knew of the foregoing (hereinafter sometimes referred to as "RBC Persons"). Because of the RBC Persons' senior officer status, their knowledge can be imputed to RBC. At all times the RBC Persons were acting within the scope of their express and implied authority on behalf of RBC in pursuit of profits for RBC.

C.    **RBC's Undisclosed Operation And Control Of The OUL Investments In Mosaic Was Contrary To Applicable Law**

49.    RBC ignored and otherwise violated regulations in Canada applicable to "alternative investments." In truth and in fact, the investments at issue herein controlled by RBC were "alternative investments," the accepted term in Canada for investments such as hedge funds, funds of funds and structured products linked to hedge funds. See AIMA "Canadian Hedge Fund Primer."

50.    The principle regulation ignored by RBC was the regulation under Canadian securities laws that required the registration of "Investment Managers" with the Ontario Securities Commission. Had RBC registered, as required, as the Fund's investment manager,

RBC would have been unable to conceal its role and activities in the Fund which led to the investors' losses.

51.    Had RBC complied with applicable Canadian law, plaintiffs would have been afforded complete protection of their investments. The RBC Option had all of the main attributes of the type of instrument regulated under Canadian law and known as a Principle Protected Note ("PPN"), but RBC refused to register it as such. For the protection of investors, Canadian law requires bank issuers such as RBC of PPNs to treat it as an obligation of the bank (albeit an uninsured obligation). Had RBC properly represented the RBC Option as a PPN, RBC would have been required to account for same and report same as an obligation of RBC. However, to do so would have adversely impacted RBC's balance sheet and regulatory capital ratios and reserves. It was to RBC's advantage to avoid such reporting and avoid having to treat Investors' investments as "PPNs" which would thereby have been RBC's obligations to repay. To avoid accountability for the investors' monies, RBC concealed its role in the investment and fraudulently described its participation in the Fund as seller of an "option" rather than as the issuer of a PPN. So fearful was RBC of potential liability arising out of the sale of the Funds that RBC flouted Canadian regulations requiring RBC, as the de facto investment manager, to register as such with the Ontario Securities Commission.

52.    If not PPNs, the Funds should have been represented and marketed as "mutual funds." As mutual funds, Canadian and Quebec provincial regulations would have imposed regulations on (1) disclosures to potential investors (2) the use of leverage (and prohibited the 600% leverage of the RBC Option) (3) compensation of fund mangers (such as RBC despite its concealment of its role as such); and (4) the payment of incentive fees. See National Investment Sections 81-102, 81-104, and 81-105. Moreover, if RBC had registered the Fund as a mutual

fund it would have been prohibited from investing in the "alternative investments" which resulted in investor losses.

53.    Moreover, had RBC registered the "investments' as "mutual funds," regulations would have required RBC to redeem the investments on demand at "net asset value" for any investor. Although OUL and RBC marketed investments as a "Fund' and sold investors "redeemable preference shares," RBC failed to register the investments as a mutual fund in order to avoid regulation and to partake of a greater share of fees than would be otherwise allowable under Canadian and Quebec provincial law applicable to RBC, a Canadian banking institution.

54.    RBC's Option, though marketed and promoted as an investment with PPN features, in fact subjected investors to shifting exposure to the underlying assets and was subject to leveraging and deleveraging risks which were favorable to RBC but not favorable to investors and which were not adequately disclosed.

55.    RBC operated the Fund clandestinely in order to avoid Canada's continuous disclosure requirements (NI 81-106) which requires annual financial statements to be filed with regulators and mailed to investors. The last financial statement prepared by or on behalf of the Funds was in September 2003. Thus, after September 2003, plaintiff and other investors had no way of understanding the precarious financial condition and illegal structure of the Fund.

**D.    A Massive Fraud And Deception By RBC Induced Plaintiff To Invest In The Fund And Remain Invested Until The Collapse Of The Fund**

56.    Defendants, in the course of their dealings with the Norshield entities and Olympus Univest, knew the structure and nature of the Olympus Univest and Mosaic funds, and the composition of the underlying assets and securities. Defendants knew the composition of the hedged assets underlying the RBC Option.

57.    The Fund's reported objective was to "earn an above average risk-adjusted

return." In promotional material it was stated:

> The primary objective of the Fund is to diligently follow an
> investment strategy that focuses on preservation of capital
> combined with absolute return features of alternative investment
> strategies. Diversification in types of securities, advisors and
> strategies will seek to normalize returns and minimize risk.
> Exposure will typically be in established investment funds and
> advisors with proven performance and value growth.

58.    As to investment strategy, it was stated:

> The Fund primarily achieves its investment strategy by investing
> through Investment Advisors that are carefully monitored and
> selected by the Investment Manager. These investments can be
> made directly into managed accounts, through Hedge Funds or via
> counterparties. The Investment Manager has established a series
> of captive regulated Olympus Univest Funds ("The Olympus
> Univest Sub-Funds") that are under common management of the
> Investment Manager. The Olympus Univest Sub-Funds have been
> established to facilitate investor customization by investment
> strategy and to provide an audited track record of the strategy
> concerned. The Fund will invest in the Olympus Univest Sub-
> Funds in allocations determined by the Investment Manager.

59.    The description of the assets of the Fund in informational materials was materially

false and misleading because it failed to disclose the existence or relationship of the Channel

Fund assets to Olympic Univest, making it appear that the Fund had few liabilities and

substantial net assets when in fact, the Fund had substantial exposure to the undisclosed leverage

on the RBC Option and its NAV's were overvalued due to the inflated values of the Channel

Funds. This description was further false and misleading because Fund investors were not

informed that these assets and the underlying basket of securities related to these assets were

being used as collateral to secure the loan made by the RBC Defendants pursuant to the RBC

Option.

60.     The PPM and other informational materials distributed to investors during the relevant time, failed to disclose:

a.     RBC Defendants' role in the management of the hedge fund investments and risk allocations, including the approval and selection of hedge fund managers;

b.     the non-segregation of assets and risk to investors based on the underlying assets and liabilities of Mosaic;

c.     the illiquid nature of the investments in the Channel Funds and investors' exposure to those risks;

d.     the alleged acceptance by Olympus Univest of subscriptions "in kind;"

e.     the ability of "in kind" subscribers to redeem their shares for cash;

f.     the nature of the "in kind" assets allegedly invested; and

g.     the basis of the valuation for the "in kind" subscriptions.

61.     The Fund's disclosures to investors fell far short of standard industry disclosures relating to the marketing promotion and sale of "alternative investments". Such standard disclosures include:

A Fund's intended strategies;

A Fund's investment objectives;

A Fund's risk management policies and investment restrictions

A fund's type and source of leverage;

A Fund's permitted scope of leverage;

A fund's management of leverage (i.e., whether discretionary or automatic);

A Fund's cost of leverage;

A fund's source of leverage;

The recourse or non-recourse nature of the leverage;

A fund's method of calculating redemption prices;

A fund's method of calculating NAV;

A fund's ability of suspend redemptions;

A fund's "lock-up" periods.

62.    The Offering materials misrepresented the nature of the investment which did not focus on preservation of capital and minimization of risk but, in fact, created enormous exposure to investors though the use of undisclosed leverage and also overstated the Fund's NAV's. The PPM further misrepresented the nature of the Fund's selection of investment advisors and trading strategies – contrary to the PPM and its lengthy and detailed description of the selection process for portfolio managers, investment advisors and asset allocation strategies were being selected, reviewed and approved by the RBC Defendants.

63.    Defendants knew undisclosed material adverse facts relevant to share buyers and owners but concealed same. Defendants' knowledge is reflected by the fact that on or about November 10, 2004 when Univest Multi Strategy Fund II LTD assumed the Cash Settled Equity Barrier Call Option ("CSEBCO") pursuant to the assignment agreement between Mosaic Composite limited and RBC, RBC insisted that Univest Multi-Strategy execute a "Risk Disclosure and Acknowledgement Statement". Among other risk disclosures that RBC forced Univest Multi-Strat to acknowledge were:

(i)    Univest, and therefore investors therein, were receiving not ownership rights in underlying economic instruments but rather only "an adjusted economic return of a

basket" which is comprised of a selection of private investment vehicles and/or specific managed accounts;

(ii)    CSEBCO "involves structured over-the-counter options for which there is no established secondary trading market and for which it is unlikely that a secondary market will develop";

(iii)    RBC could withhold its consent for any sale assignment or transfer of the CSEBCO and RBC had no contractual obligation or other legal obligation to allow Univest Multi Strat to terminate the option;

(iv)    The CSEBCO was highly leveraged and the "Funds" in which the Basket was invested was also leveraged;

(v)    RBC was acting as principal and not a financial manger, fiduciary or investment adviser with respect to the CSEBCO;

(vi)    The values of the Funds asset and thus the value of CSEBCO was not obtained from market quotations; and

(v)    Certain of the Funds were managed by third party investors in separate accounts which could experience losses in excess of 100% of the initial allocation.

64.    From at least the inception of the RBC Option in August of 1999, the method used to calculate the Net Asset Value ("NAV") of the various classes of shares of the Norshield Investment Structure entities was improper. The NAV was based on the underlying value of the assets in the RBC option and the assigned value of the Channel Funds. The calculation of NAV's for the Fund failed to recognize the liability of offsetting bank loans; failed to exclude the value of non-hedged assets of Mosaic; blended the returns of all assets rather than reported them as strategy specific, resulting in overstated subscription prices to plaintiffs and other investors

and the overstatement of redemption values leading to an accelerated erosion of the asset base. The RBC Defendants, having performed due diligence and in their capacity as de facto manager of the operations, knew of these facts which were not disclosed to investors.

65.    In addition, through this same course of dealings, Defendant RBC's agent, Defendant RBC Capital, knew that the NAV calculations for Olympus Univest did not account for the Fund's liability under the RBC Option (the leverage) or the illiquid assets in the non-hedged portfolio. As custodian of the hedged securities, Defendant RBC Capital on behalf of RBC knew the net asset values for the investments held in the Fund's basket of securities. Defendant RBC Capital agreed with Norshield that the maximum leverage allowed could not exceed the amount of unhedged assets of Mosaic, therefore Defendant RBC Capital knew the real value of such assets and the divergence between the real value and value carried on MCL's financial statements.

66.    RBC Defendants, relying on the purported values in the Channel Funds, increased the leverage of the hedged assets as the Channel Funds purported assets increased in value. At least as early as 2002 the investments in the Channel Funds were impaired. These increases permitted by the RBC Defendants aided and abetted the fraud of the Norshield Financial Group.

67.    As funds originating from investors flowed through the Norshield Investment Structure from one entity to the next, significant dissipation of investor funds occurred as a result of redemptions at inflated NAVs, unexplained third party payments and the costs of maintaining the investment structure itself. Many of the assets throughout the Norshield investment structure were illiquid.

68.    Norshield Companies, Olympus Univest and Mosaic attempted to camouflage the dissipation of investor funds by artificially inflating not only the underlying value of the assets

purportedly held by each entity within the Norshield investment structure, but also by artificially inflating the NAV's presented to the investors in each entity within the investment structure.

69.     Not only was the underlying value of the assets held by the entities within the investment structure inflated, but a significant portion of those assets were also illiquid. Consequently, in the months leading up to the collapse of the Fund, subscriptions to Olympus Univest were used to pay redemptions. There was an enormous disparity between the real value of the underlying assets within the Norshield Investment Structure and the NAVs reported to investors, as well as illiquidity of the assets.

70.     No audited financial statements were prepared or filed for any of the entities referred to in the Norshield Investment Structure (with the exception of NAM) for financial periods after September 30, 2003.

71.     In order for the calculating of the NAVs of the entities within the Norshield investment structure to be supported, Mosaic's non-hedged assets would have to have had, at a minimum, a realizable value equal to or greater than the outstanding amount of the leveraged RBC Option through Defendant RBC Capital which were secured by Mosaic's hedged assets. As stated above, Mosaic's non-hedged assets consisted principally of illiquid investments in the Channel Funds.

72.     The overstatement of assets in the Channel Funds allowed Defendant RBC Capital to increase the level of borrowing under the RBC Option to over $300 million in 2004. As Mosaic increased the amount borrowed under the RBC Option, the RBC Defendants had to review and approve such increases, therefore the RBC Defendants knew of the overvaluation of the Channel Funds (or unhedged assets) as the amounts borrowed under the RBC Option were tied directly to the value of the Channel Funds.

22

73.    Defendants knew of the hedged and unhedged assets that went into the merged fund and knew the true nature of the overall asset composition involving both hedged and unhedged assets. As the seller of the RBC Option and the account holder of the underlying basket of securities, having reviewed the Olympus Univest prospectus and accompanying financial statements, and having conducted an audit pursuant to the Patriot Act, the RBC Defendants knew that the hedged assets were not accurately represented on Olympus Univest's books, as none of the leverage was reflected on its balance sheet. RBC essentially held all of the Fund's assets as collateral against its loan underlying the RBC Option, a fact which was not disclosed to Fund investors.

74.    As of September 30, 2003, a substantial portion (90% or $404 million) of the total assets ($448 million) carried on the audited consolidated financial statements of Olympus Univest consisted of its investment in MCL.

75.    On that date, MCL's audited financial statements for the period ended September 30, 2003 disclosed assets totaling $770 million consisting of:

    a.    hedged assets (consisting of the RBC Option, managed futures accounts and tactical trading accounts) with a gross value of $388 million against which there was an outstanding secured margin loan of $300 million;

    b.    investments in the Channel Funds having a carrying value of $307 million; and

    c.    other assets having a carrying value of $75 million.

76.    The NAVs which were provided on a weekly basis by MCL for presentation to the preference shareholders of Olympus Univest and to other investors were calculated almost

entirely on the value of the basket of securities underlying the hedged assets of Mosaic without considering any leverage or the Channel Funds.

77.    The vast majority of the investments allegedly made in the Channel Funds were placed into non-arms length entities which had little or no realizable value.

78.    RBC Capital tied the increase in leverage under the RBC Option directly to the increase in the value of Mosaic's unhedged assets. Thus, RBC Capital would only increase its loan under the RBC Option when it was satisfied that the value of **unhedged** assets was adequate – i.e. at least as high as the loan amount, even though those assets **were not** providing collateral for the loan. Therefore, it knew of the overvaluation of such assets and the NAV's reported. On September 30, 2003, the portfolio of hedged assets was reportedly worth $440 million.

**E.    The Collapse Of The Fund Was Preceded By Preferential Transfers And RBC's Premature Withdrawal Of Assets**

79.    On October 29, 2004, RBC, MCL and Univest Multi-Strategy Fund II Ltd. entered into an assignment agreement the purpose which was to assign all of MCL's rights interests and obligations under the Option to UM-SF II. The parties agreed that the assignment was governed by New York law and that any action could be brought in any court of New York.

80.    In order to meet increasing redemption demands, generate liquidity and support its operations, Mosaic with knowledge of RBC, entered into a series of transactions beginning in with the agreement with UM-SF II. As a result of these transactions, UM-SF II was the sole counter party to the Cash-Settled Equity Barrier Call Option. The transactions were structured so that Mosaic could retain an economic interest in the RBC Option and continue to carry its net asset value, as well as the net asset value of Olympus Univest, Olympus Bank and Olympus Funds on its financial statements. By constructing the transaction in this fashion, with the RBC

Defendants' express permission, Fund investors continued to be misled regarding the Fund shares' NAV's, the liquidity problems of the Fund and the risks inherent in their investment.

81.    No later than November 2004, Defendant RBC Capital knew of the liquidity pressures of the Olympus Univest and MCL funds when it agreed to an assignment of the RBC Option to Univest Multi-Strategy Fund II Ltd., to enable the Funds to raise approximately $30 million to improve their liquidity position to meet redemptions by entering into a transaction with Merrill Lynch.

82.    On or about November 1, 2004 MCL and Univest Convertible Arbitrage Fund, Ltd. And Univest High Yield Fund Ltd. ("UHYF") entered into an agreement whereby MCL agreed to sell 16,667 Class A participating non-voting shares in Univest Multi Strategy Fund II Ltd for a purchase price of 15 million dollars to the Univest Purchasers (the arbitrage fund and the hi-yield fund). By agreement dated as of November 1, 2004 MCL and Univest Convertible Arbitrage Fund Ltd., Univest High Yield Fund Ltd. agreed that MCL would sell 16,667 Class A participating non-voting shares with a net asset value of 16,667,000 in Univest Multi-Strategy Fund II Ltd. for $15,000,000 to the Univest purchasers. In the agreement the parties represented:

> Composite and the Univest Purchasers acknowledge and agree that the Investment Manager and the Directors are permitting the sale solely as an accommodation to them and that none of the Investment Managers, the Director, the Fund, or any Norshield Party assumes any responsibility whatsoever for the legal tax or other consequences of the sale.

In connection with the foregoing agreements RBC required Univest Multi Strategy to sign a risk disclosure and acknowledgement statement and a separate "understanding" purporting to state RBC's participation as Principal for its own account rather than as a financial adviser of manager of the investments.

83.     In Spring 2005, according to testimony by a high ranking RBC Dominion officer under oath at a proceeding before the OSC, RBC learned from Olympus that it expected large redemptions shortly.  In early 2005, the redemption pressures at OUL exhausted that entities liquidity reserves.

84.     In early 2005, RBC determined that it was in RBC's interest to terminate its relationship with Mosaic.  RBC waited until June 2005 to terminate the RBC Option and sell all the Mosaic hedged positions, which RBC held in RBC accounts and take for itself the principle and fees to which it was entitled, in its view, without discussion or consultation with Mosaic, the Olympus Univest or Norshield.

85.     As herein alleged RBC controlled Mosaic.  RBC was the Investment Manager of Mosaic.  Its behavior in terminating the option and taking its principal and fees is more evidence of that management control.  In equity and fairness, RBC's claim as a senior secured creditor (or under its rights as an option seller) should be subordinated (or at least made parri passu) to the other creditors of Mosaic, including the redemption claim by Mosaic's investor, Olympus Univest.  RBC should not be permitted to aid and abet Mosaic and Olympus Univest in its continued, knowing, failure to disclose the RBC arrangement and still retain its rights as a senior secured lender and/or under the options agreement).  RBC should not receive the benefits of that lack of disclosure.  Nor should RBC be permitted to control Mosaic, i.e., be the Investment Manager of Mosaic and have a preferential right to repayment before redeeming shareholders of Mosaic.

86.     Here, RBC's undisclosed power to terminate the Option subjected investors to the potential collapse of the Funds and loss of the investors' entire investment even in the event of minor fluctuations in value of the assets underlying the Option.

87.     On June 1, 2005, Mosaic received a letter stating that Defendant RBC was going to terminate the RBC Option using the early termination provision and liquidate the portfolio. See Exhibit J. RBC improperly terminated the RBC Option on grounds which it was not entitled to terminate, and liquidated the underlying portfolio before it was permitted to under the contract. Defendant RBC wrongfully liquidated the portfolio to the detriment of Fund investors, improperly took the proceeds from the account, thereby precipitating the collapse of Olympus Univest.

88.     RBC provided notice of early redemption of the Olympus Univest Principal Protected hedge Fund Linked Deposit Notes, Series 1, effective July 12, 2005.

89.     As of June 5, 2005, the Fund had received approximately $350 million from investors which had not been redeemed.

90.     RBC prematurely ended the option in July 2005 because of concerns that there would be a run of redemptions and RBC knew that if the funds were forced to liquidate asset quickly to honor redemptions that it would be RBC who would bear the loss rather than investors such as plaintiffs.

## FIRST CLAIM FOR RELIEF
### (Against Defendants For Breaches Of Fiduciary Duty)

91.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

92.     Defendants by virtue of their discretionary power to direct and manage the investments of plaintiffs' assets and by virtue of their actual investment management activities were at all relevant times investment managers of the plaintiffs' assets and the Funds.

93.     At all relevant times, Defendants were obligated as, and assumed upon themselves, the role of "fiduciary" with respect to the investment accounts.

27

94.    As a fiduciary, Defendants were required to: [A] discharge their duties with respect to the plan with an undivided duty of loyalty and solely in the interest of the investors and beneficiaries; and (B) invest and manage the assets held in accordance with the prudent investor standard in that they must: (i) exercise reasonable care, skill and caution to make and implement investment and management decisions as a prudent investor would for the entire portfolio; (ii) pursue an overall investment strategy in accordance with the risk objectives reasonably suited to the entire portfolio; (iii) consider a number of detailed factors relating to the portfolio and economic conditions; and (iv) diversify assets.

95.    When a fiduciary has breached a fiduciary duty, the fiduciary must make the beneficiary (here plaintiffs) whole for any damage resulting from the breach. The appropriate measure of damages requires putting the beneficiary in the same condition in which he would have been if the wrong had not been committed and the trustee had fulfilled the fiduciary duty.

96.    Defendants were responsible for the investment decisions in plaintiff's portfolios managed by defendants. Defendants violated fiduciary obligations of due care by failing to promptly manage and oversee the assets of the investment accounts; failing to pursue a prudent investment strategy; and by failing to eliminate conflicts of interest. Defendants' selection, monitoring and continuation of investment strategies and alternatives were negligently planned, performed and monitored.

97.    As a direct and proximate result of these acts and omissions, the plaintiffs suffered losses which resulted in losses of the entire investment, and lost opportunities for profits.

98.    Plaintiffs, pray for relief compelling the defendants to make restitution and/or make good the losses by restoring to investment accounts losses on positions held which the

defendants improperly purchased or failed to sell in breach of its fiduciary duty.  Further, plaintiffs seek the disgorgement of any profits obtained by defendants as a result of their violations.

**SECOND CLAIM FOR RELIEF**
**(For Aiding and Abetting Breach of Fiduciary Duty)**

99.     Plaintiffs reallege each of the foregoing allegations as if fully set forth herein.

100.     Plaintiffs bring this claim for aiding and abetting breach of fiduciary duty by Norshield and/or Olympus and/or Mosaic against Defendants.

101.     Members of the Norshield Financial Group were fiduciaries of plaintiffs by virtue of their acts in soliciting, receiving, managing and controlling the investments that plaintiffs made to the Olympus Univest; by holding themselves out as professional and reputable experts in the field of hedge fund investments and as financial advisors; by virtue of their status as financial and investment advisors; by their acts and omissions in investigating, monitoring and managing plaintiffs' investments in the Fund; and because of their superior knowledge concerning hedge fund investments generally and the Olympus Univest Fund specifically. Plaintiffs reasonably reposed trust and confidence in the integrity and fidelity of the Norshield Financial Group in connection with the investments they made in the Fund.

102.     As fiduciaries, the Norshield Financial Group owed plaintiffs duties of loyalty, due care and fair dealing, including, inter alia:  To protect the interest of plaintiffs; to refrain from doing any act injurious to, or which would deprive plaintiffs of, any profit or advantage; to provide plaintiffs with accurate and materially complete information; and to not elevate their own interests ahead of plaintiffs.

103.     The Norshield Financial Group violated their fiduciary duties to plaintiffs, inter alia: making numerous material misrepresentations and omissions of facts regarding the Fund;

29

failing to perform proper due diligence and ongoing monitoring for Plaintiff's investments in the Fund; ignoring or failing to uncover and timely disclose to investors the identified above; and failing to properly update plaintiffs members regarding their investments in the Fund, all as alleged more fully above.

104.    Each of the Defendants participated in an alleged course of conduct, and knew of the numerous breaches of fiduciary duties by the Norshield Financial Group and aided and abetted numerous breaches of fiduciary duties that were committed by the Norshield Financial Group, all as alleged herein.

105.    Each of the Defendants participated in the misconduct and aided, encouraged and/or ratified such misconduct for its own benefit, as fully alleged above.

106.    As a direct and proximate result of the Defendants' aiding and abetting the breaches of fiduciary duties, plaintiffs were damaged.

### THIRD CLAIM FOR RELIEF
### (For Fraud)

107.    Plaintiffs reallege each of the foregoing allegations as if fully set forth herein.

108.    Plaintiffs bring this claim for fraud against the RBC Defendants.

109.    The Defendants participated in a common plan or course of conduct that was designed to commit a fraud upon plaintiffs.

110.    Each of the Defendants participated in the alleged fraudulent course of conduct through active participation, aid, encouragement and/or ratification of the fraudulent misconduct alleged above, for its own benefit, and did so having known of that fraud, or but for its gross negligence or recklessness should have known of the fraudulent nature of that course of conduct, in particular as follows, all as alleged more fully above.

30

111.    As alleged more fully above, each of the Defendants aided and abetted the fraudulent activities of each other defendant.

112.    Plaintiffs were injured by the fraud of the Defendants alleged above.  The Defendants are therefore jointly and severally liable to plaintiffs for all damages incurred resulting therefrom in an amount to be proven at trial.

### FOURTH  CLAIM FOR RELIEF
**(For Unjust Enrichment and Restitution Against the RBC Defendants)**

113.    Plaintiffs reallege each of the foregoing allegations as if fully set forth herein, except for allegations related to fraud.

114.    Plaintiffs bring this claim against all of the Defendants.

115.    Plaintiffs entered into fiduciary, legal and/or other business or other relationships with the Defendants as alleged above.

116.    Plaintiffs made investments, and assigned their assets and/or conferred compensation and other financial benefits upon Defendants in various forms of direct and indirect fees, compensation and other charges for services that were to be rendered in connection with the management and trading of investments in the Fund.  In particular, the Defendants received fees in connection with its brokerage and investment banking services to the Fund and in the sales of the RBC Option.  All of the foregoing benefits were requested, voluntarily accepted, and retained by Defendants with knowledge of the material facts.

117.    Defendants derived benefits from their relationships with plaintiffs.  Through their inequitable conduct, Defendants obtained investments from plaintiffs, fees, compensation and other emoluments and benefits (in excess of $60 million) which they did not properly earn or were rightfully entitled to, and Defendants have thus been unjustly enriched.  It would be

inequitable for the Defendants to retain such investments fees, compensation and other benefits they derived from plaintiffs in connection Fund without repaying plaintiffs the value thereof.

118.    In addition, these Defendants improperly terminated the RBC Option retained the proceeds fro the underlying securities for their own benefit at the expense of investors. Accordingly, the Defendants have been unjustly enriched by their own acts, including, inter alia, improperly termination the RBC Option.

119.    By reason of the foregoing, Defendants have been unjustly enriched in an amount to be proven at trial which, in justice and fairness and in the alternative to the extent not duplicative of any of the other claims for relief requested herein, and/or to the extent plaintiffs are for any reason denied relief on account of the other claims set forth herein, should be paid over to the plaintiffs.

### FIFTH CLAIM FOR RELIEF
### (Breach of Contract As Third Party Beneficiaries
### Of The Contracts Between RBC And Norshield)

120.    Plaintiffs repeat and reallege each allegation above.

121.    Plaintiffs were third party beneficiaries of all contracts between RBC and Norshield.

122.    Defendants owed contractual obligations to Plaintiffs pursuant to contracts under which Defendants agreed to invest Plaintiffs' assets.

123.    Defendants' failure to eliminate the conflicts of interest that adversely affected Defendants' ability to manage the assets of the Plaintiffs in accordance with the terms and conditions of the contract, and constituted a breach of contract.

124.    Defendants are liable to Plaintiffs for the damages incurred as a result of their breach of contract.

125.    Plaintiffs have been damaged by each Defendant's conduct.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for the following relief:

1.    finding that the RBC Defendants committed the misconduct and violations alleged;

2.    awarding plaintiffs damages, including but not limited to compensatory, and punitive damages, together with interest thereon, to the maximum extent permitted by law;

3.    awarding plaintiffs their costs and expenses of this litigation including but not limited to reasonable attorneys' fees, experts' fees and other costs and disbursements; and

4.    awarding plaintiffs such other and further relief as may be just and proper in the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims and issues so triable.

Dated: May 30, 2008

SQUITIERI & FEARON, LLP

By: _____
Lee Squitieri (LS-1684)
32 East 57th Street
12th Floor
New York, New York 10022
(212) 421-6492

WEXLER TORISEVA WALLACE LLP
Kenneth A. Wexler
Edward A. Wallace
55 West Monroe Street
Suite 3300
Chicago, Illinois 60603
(312) 346-2222